UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

LISA ARGUELLO,

                        Plaintiff,

v.                                                    ACTION NO. 4:19cv42

ANDREW M. SAUL,
Commissioner of Social Security,

                        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Lisa Arguello ("Arguello") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("SSA"), denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. ECF No. 1.

An order of reference assigned this matter to the undersigned. ECF No. 12. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Arguello's motion for summary judgment (ECF No. 14) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 16) be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

## I.    PROCEDURAL BACKGROUND

Arguello protectively filed an application for DIB on August 24, 2012, alleging that she became disabled on September 18, 2010, due to cataracts, depression, neuropathy, arthritis, mixed connective tissue disease, dry eyes, dry mouth, Sjögren's syndrome, weakness in her legs and

arms, and night blindness.[1]  R. 20, 55–56, 147, 171.  Following the state agency's denial of these claims, both initially, R. 85, and upon reconsideration, R. 97, Arguello (represented by Brian J. Gillette, Esq. ("Gillette"),  R. 83–84,) requested a hearing before an Administrative Law Judge ("ALJ").  R. 105–06.

ALJ Irving A. Pianin heard the matter on January 21, 2015, and issued a decision denying DIB on February 12, 2015.  R. 20–27, 32–54.  On June 21, 2016, the Appeals Council denied Arguello's request for review of the ALJ's decision.  R. 1–3.

Having exhausted all administrative remedies, Arguello filed a complaint in this Court on September 8, 2016, and was represented by Robert W. Gillikin, II, Esq.  *See Arguello v. Colvin*, No. 4:16cv138, ECF No. 3.  After Arguello filed her motion for summary judgment and supporting memorandum, the parties jointly agreed to remand the case to the Acting Commissioner of Social Security ("Commissioner") to further develop the record and to re-evaluate Arguello's claim of disability.  *See id.*, ECF Nos. 13–16.  The Court granted the parties' consent motion to remand by order dated January 19, 2017.  *Id.*, ECF No. 17.  More specifically, on remand, the Court directed that the ALJ:

> (1) conduct a new hearing; (2) take all necessary steps to complete the administrative record; (3) make specific findings as to whether any of Plaintiff's past work constitutes past relevant work, and, if so, make specific findings about the physical and mental demands of the past work; and (4) resolve any apparent conflicts in the vocational evidence in accordance with the requirements of Social Security Ruling 00-04p and *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015).

*Id.*, ECF No. 17 at 1.

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court under a certification page dated May 25, 2019, which is consecutively paginated from 1 through 903.

On December 20, 2017, ALJ Pianin held a second administrative hearing at which Arguello, represented by Gillette, and a vocational expert, Barbara Byers ("Byers" or "VE"), testified. R. 626–47. On January 11, 2018, the ALJ issued a decision in which he found Arguello was not disabled. R. 578–90. Arguello filed specific exceptions to the ALJ's decision on February 1, 2018, arguing that unrebutted evidence indicated she was limited to "frequent" fingering, which made her unable to perform her past relevant work as a title clerk. R. 573–74, 683–84. On February 28, 2019, the Appeals Council denied Arguello's request for review, finding the ALJ adequately explained his reasoning and that his decision was supported by substantial evidence. R. 566–70. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having again exhausted all administrative remedies, Arguello filed a complaint in this Court on April 25, 2019, asserting that the denial of Arguello's disability claim is not supported by substantial evidence. ECF No. 1. The Commissioner answered the complaint on July 2, 2019. ECF No. 10.

In response to the Court's order, Arguello filed a motion for summary judgment and supporting memorandum on August 9, 2019. ECF Nos. 13–15. The Commissioner filed a motion for summary judgment and supporting memorandum on August 30, 2019. ECF Nos. 16–17. Arguello did not respond to the Commissioner's motion and the time to do so has expired. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II.   RELEVANT FACTUAL BACKGROUND

Arguello protectively filed an application for DIB on August 24, 2012, alleging that she became disabled on September 18, 2010 due to cataracts in both eyes, depression, neuropathy,

rheumatoid arthritis, mixed connective tissue disease ("MCTD"), dry eyes, dry mouth, Sjögren's Syndrome, weakness in both her legs and arms, and night blindness. R. 20, 55–56, 147, 170–78.

In her memorandum in support of summary judgment, Arguello indicates a narrower issue regarding her handling abilities. Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 15 at 6–7. As such, the Court will evaluate and discuss only the evidence relevant to Arguello's handling abilities within the time period between Arguello's alleged disability onset date of September 18, 2010, and her date last insured ("DLI") of December 31, 2012.

## A.   *Background Information and Hearing Testimony by Lisa Arguello[2]*

Arguello is a resident of Hampton, Virginia, has a high school education, and was 55 years old as of her DLI of December 31, 2012. R. 37, 147–48, 629. Although she previously worked, Arguello now stays home by herself during the day, while her husband is at work. R. 36–37. She alleged she needed assistance performing tasks such as bathing and cooking, but could complete small household tasks, such as dusting, moving laundry from the washer to the dryer, and making the beds. R. 37, 43–44. Additionally, Arguello stated she could drive "once in a while," but sometimes her hands will go numb while she drives. R. 45. She also alleged her primary care physician, Dr. Ayres, told her to "get disability, because of all of [her] ailments" and because she continued to miss work. R. 41.

In response to questioning by the ALJ concerning her employment history, Arguello testified that she had worked most significantly as a title clerk (over ten years) at automobile

---

[2] The facts discussed in this section are primarily from Arguello's second hearing before an ALJ on December 20, 2017, R. 626–47, with some facts from the first hearing on January 21, 2015, R. 32–54.

dealerships, but had also been a waitress, and a telephone operator.[3]  R. 39, 161–62, 632.  Asked whether she could return to working as a title clerk, Arguello testified her pain prevented her from doing so:  "My hands they are very numb and red, and they go numb [for more than an hour]."  R. 39–40.  Arguello stated she was able to lift less than 5 pounds.  R. 41.  As for functions involving her hands—such as reaching, handling, fingering, grasping, turning, and twisting objects—Arguello testified she would have difficulty in the title clerk position because she had trouble picking up objects.  R. 47.  If she could pick up an object, Arguello stated it would "drop right out of [her] hand."  *Id.*

Arguello's duties in working as a title clerk for various auto dealerships involved:  (1) filing and working on the computer to issue license plates, registrations, and stickers; (2) walking to take inventory of cars; (3) answering phones, and taking care of customers; and (4) performing "significant overhead reaching" to access and store files above her desk.  R. 633–35.

Arguello completed a Disability Determination Services ("DDS") pain questionnaire on January 10, 2013.  R. 179–80.  In the questionnaire, Arguello described her pain as aching, stabbing, burning, throbbing, cramping, and crushing, and stated it was "everywhere."  R. 179.  Arguello also explained that the pain had been present for approximately five years, is constant and does not go away, and prevents her from performing movements such as bending, squatting, stooping, reaching, standing, and sitting.  R. 179–80.  In response to the questionnaire's inquiry about activities or medications that improve her pain, Arguello answered, "nothing."  R. 180.

---

[3] In considering Arguello's past relevant work, the ALJ will consider work experience done within the last 15 years from the DLI.  *See* 20 C.F.R. § 404.1565 ("A gradual change occurs in most jobs so that after 15 years it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply.  The 15-year guide is intended to [e]nsure that remote work experience is not currently applied.").  Here, because Arguello's DLI was 2012, the ALJ considered work from 1997 until 2012.  *See* R. 632.

With the help of friends and/or family who completed the form on her behalf, Arguello also submitted two disability function reports. *See* R. 181–88, 189–96, 224–31. The first report, dated January 10, 2013, explained Arguello lived with her husband and 17-year-old son, and that both helped to care for her. R. 182, 190. In examining how her conditions affected her ability to complete personal care tasks, Arguello stated she needed help dressing, bathing, and shaving, but was capable of feeding herself and using the toilet. *Id.* She claimed to be unable to prepare her own meals, and could not complete any house or yard work without help. R. 183, 191. To get around, Arguello explained she primarily rode in cars, noting she could drive during the day but could not see at night. R. 184, 192. As for shopping for food and other necessities, Arguello estimated it would take about 1.5 hours to shop for the week. *Id.*

As for her hobbies and interests, Arguello stated that, since her conditions began, she watches more TV. R. 185, 193. She claimed her social activities were limited to talking on the phone, and leaving the house only for doctors' appointments and grocery shopping. *Id.* To provide further information about how her abilities were affected by her impairments, Arguello acknowledged she was now limited in the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, seeing, remembering, completing tasks, concentrating, understanding, following instructions, and using hands. R. 186, 194. Arguello indicated she was right-handed. *Id.* Near the end of the questionnaire, Arguello explained she had unusual behaviors and fears because of her conditions, stating, "I feel like I'm never gonna be better." R. 187, 195.

In a second, undated function report[4], completed by her husband, Arguello's conditions

---

[4] Because the information provided in the second report generally conveys a worsening of Arguello's conditions and increasing limitations in her daily activities, the second report appears

appear further restricted. R. 224–31. In it, Arguello describes her daily activities: "Get up, brush teeth, use bathroom, watch TV [for] about 4 hours per day, read books/magazines in [the] evening, husband or son prepares dinner [and,] after that I watch TV, shower, [and] go to bed." R. 224. Attesting to her life prior to the onset of her conditions, Arguello stated that she was previously able to work, complete everyday chores, and walk her dog, but could no longer do so. R. 225. Despite having indicated that she could use the toilet by herself, she reported having difficulty getting up and down. *Id.* She also emphasized difficulty sleeping any consecutive length of time. *Id.* While capable of preparing some meals, Arguello explained she was restricted to making sandwiches, ordering out, and using the microwave on occasion. R. 226. Arguello was only capable of performing "light dusting" and sweeping, and it took her twice as long as it did before her conditions developed. *Id.*

Previously, Arguello claimed she shopped in stores, but in her second function report she reported shopping only over the phone, by mail, or by computer. R. 227. Arguello explained her hobbies and interests were limited, and that she did not enjoy activities as she used to and could not do anything for extended periods of time. R. 228. She indicated her conditions affected her ability to do the following: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, concentrate, understand, follow instruction, and use her hands. R. 229. Arguello claimed she feared the uncertainty of her future health, which made her very emotional. R. 230.

**B.    *Treatment Records from Nancy Ayres, M.D. ("Dr. Ayres")***

Prior to her alleged disability onset date of September 2010, Arguello began seeing Dr. Ayres at Family Medicine and Women's Healthcare in Newport News, Virginia. R. 340–65. On

---

to have been completed after Arguello's first report dated January 10, 2013. *Compare* R. 181–88 (first function report), *with* R. 224–31 (presumed subsequent report).

September 21, 2010, Arguello presented with symptoms of back pain, and said she had been diagnosed with multiple sclerosis ("MS") within the past week. R. 344–45. Upon a physical examination of Arguello's musculoskeletal system, Dr. Ayres noted that Arguello reported back pain and Systemic Lupus Erythematosus ("SLE"), and had a normal range of motion, and full muscle strength and tone. *Id.*

Six months later, on April 6, 2011, Dr. Ayres saw Arguello for similar complaints of back pain, and Dr. Ayres again found Arguello had a normal range of motion and full muscle strength and tone. R. 346–47. Dr. Ayres's assessment included a diagnosis of fibromyalgia (widespread musculoskeletal pain), but observed Arguello did not appear to be in apparent distress. R. 347. During a July 20, 2011 office visit, Arguello complained of pain in her feet and hands that woke her from sleep at night, and for which Vicodin was ineffective. R. 348. Dr. Ayres concluded that Arguello still had a normal range of motion and full muscle strength and tone. R. 349. Additionally, Dr. Ayres assessed that Arguello suffered from SLE. *Id.*

Less than a month later, on August 15, 2011, Arguello was examined by Dr. Ayres for complaints of back pain and SLE. R. 350. Relying on Arguello's own assessment of her symptoms, Dr. Ayres found Arguello was positive for arthralgias, and noted "generalized stiffness" in her musculoskeletal system. R. 350–51. Dr. Ayres's overall assessment of Arguello was that Arguello suffered from acute gouty arthropathy. R. 351. To manage her pain and symptoms, Dr. Ayres prescribed several medications: Oxycodone/Acetaminophen, Naproxen, Tylenol with Codeine, and a muscle relaxant. R. 350.

During a follow-up appointment on October 5, 2011, Arguello again complained of SLE and acute gouty arthropathy, and asked for prescription refills. R. 352–53. She denied any arthralgias and myalgias. R. 352. Dr. Ayres found Arguello had a normal range of motion,

strength and tone in her musculoskeletal system, and attributed Arguello's pain to fibromyalgia. R. 353.

Arguello saw Dr. Ayres on December 5, 2011, February 22, 2012, and June 13, 2012, and presented with a request for prescription refills due to ongoing problems, including acute gouty arthropathy, back pain, and SLE. R. 354–59. Dr. Ayres performed physical examinations at each visit and determined Arguello had no abnormalities in range of motion, muscle strength, and tone, and appeared to be in "no apparent distress." R. 354–59.

On June 27, 2012, Arguello complained of muscle spasms, and Dr. Ayres found her positive for back pain and myalgias—specifically, cramping in the forearms and legs. R. 360. Dr. Ayres concluded from a physical assessment that Arguello had generalized stiffness and discomfort, but still had a full range of motion with intact reflexes and pulses. R. 361. Treatment notes indicate Dr. Ayres planned to refer Arguello to a rheumatologist. *Id.*

Arguello continued to complain of back pain and myalgias—cramping in her forearms and leg—during an August 9, 2012 appointment. R. 362. Dr. Ayres's physical examination confirmed general stiffness and discomfort, but Arguello exhibited a full range of motion and no apparent distress. R. 363. During the last appointment within the relevant time period, September 10, 2012, Arguello presented for a prescription refill. R. 303, 364, 533.

### C.   *Treatment Records from Aarat M. Patel, M.D. ("Dr. Patel")*

Upon the referral of Dr. Ayres, Arguello presented at Bon Secours Arthritis and Osteoporosis Center of Richmond ("Bon Secours") in July 2012 for further evaluation of her chronic pain and positive Antinuclear Antibodies ("ANA") blood test.[5] R. 276–78. At Bon

---

[5] Dr. Patel noted that a positive ANA test may indicate autoimmune disease or infection and advised Arguello she should be evaluated for common autoimmune diseases. R. 278.

Secours, Arguello was seen by a rheumatologist, Dr. Patel. R. 276–95. Arguello told Dr. Patel she had been diagnosed by "someone" with SLE, rheumatoid arthritis, and MS. R. 276.

Arguello complained that she had "joint pain, diffuse pain all over her body, myalgia, . . . fatigue and swelling of the hands," which had been present for over two years and "resolve on their own without medication." *Id.* Arguello described her pain as lasting all day, but that it increased in severity near the end of the day. *Id.* Arguello further stated that the medications she took for pain—including opiates, tramadol, and Neurontin—had not helped. *Id.* During a physical examination, Dr. Patel noted Arguello had a "full range of motion, no tenderness, swelling, [or] deformity of joints" in her upper extremities, diffuse widespread pain over extremities, and mild puffiness of her fingers, but no synovitis. R. 277. Dr. Patel also found Arguello had no clubbing, cyanosis, or edema in her extremities, and had full strength, symmetrical reflexes, and normal sensation to light touch. *Id.*

Upon finding "tender points" on Arguello during the physical examination, Dr. Patel assessed her with pain syndrome (fibromyalgia), which, he observed, caused "the point at which stimuli cause pain to be lower in this patient." *Id.* Dr. Patel recommended that Arguello adopt a "regular exercise program that can be initiated with graded exercise therapy through PT/aquatherapy," and to continue taking her medications as prescribed. *Id.* Dr. Patel also ordered hand x-rays, a sleep study, and additional blood tests to assess Arguello for common autoimmune diseases. R. 278.

After receiving a series of hand x-rays in July 2012, Arguello returned to Dr. Patel's office on August 21 and September 18, 2012, at which point Dr. Patel noted she may have multiple connective tissue disease ("MCTD"), which manifested as a positive ANA test, and/or "small joint arthritis." R. 280, 282. Arguello again complained of pain in her hands, and Dr. Patel noted the

10

x-rays showed "OA [osteoarthritic] changes" in her hands.[6]  R. 280.  Despite this, Dr. Patel's physical examination of Arguello's fingers remained unchanged—he found only "mild puffiness" and no synovitis.  R. 281.  Dr. Patel reiterated to Arguello that physical therapy and aquatherapy may help to manage her pain syndrome, but Arguello stated she had no energy to participate in those therapies.  *Id.*  Noting she may have Sjögren's Syndrome, Dr. Patel started Arguello on prednisone for arthritic inflammation and fatigue.  *Id.*  During the September 2012 appointment, Arguello reported that the prednisone provided minimal relief from pain symptoms and, thereafter, was not compliant with taking the medication.  R. 282.

**D.**     ***Treatment Records from Olde Towne Medical Center***

Arguello was also treated by physician assistant-certified ("PA-C") Jezeriah Cook, at Olde Towne Medical Center in Williamsburg, Virginia.  R. 256–64.  On April 19, 2012, Arguello complained of her hands and feet falling asleep, and swelling of her extremities.  R. 256.  Arguello explained she had morning swelling and stiffness that "loosen up as the day progresses."  *Id.*  After conducting a physical examination, PA-C Cook noted Arguello appeared alert, cooperative, in no apparent distress, and had "some bogginess with . . . both hands but no stiffness, nodules or deformities."  R. 257.  PA-C Cook made the same observation during a May 17, 2012 follow-up appointment.  R. 261–62.  Similar to Dr. Patel's recommendations, PA-C Cook prescribed physical therapy.  R. 257, 262.  Arguello reported that, after attending a physical therapy session, she had decided to discontinue therapy.  R. 263.  PA-C Cook encouraged Arguello to try swimming for

---

[6] Radiologist Amos Habib ("Dr. Habib"), who was responsible for reading and signing Arguello's hand x-ray results, reported "no significant soft tissue abnormality," and "mild joint space narrowing" in her left hand.  R. 290.  As for her right hand, Brian Pacious, M.D. ("Dr. Pacious"), observed "myalgia and myositis," and "minimal osteoarthritis of [finger] joints."  R. 293.  He concluded Arguello had "[n]o erosive arthritis" and only mild osteoarthritis.  *Id.*  Dr. Pacious also concluded Arguello had "no bone erosion or periostitis," nor any "fracture, subluxation or dislocation" in her right hand.  R. 293.

exercise. R. 264.

### E.   Dr. Ayres's January 15, 2013 Medical Source Statement

On January 15, 2013, Dr. Ayres completed a physical medical source statement in support of Arguello's DIB application. R. 199–202, 299. Dr. Ayres listed the following symptoms: (1) limited joint motility and mobility; (2) limited range of motion; (3) disturbed gait; (4) loss of sensation; and (5) fatigue. R. 199. Dr. Ayres's prognosis was guarded and she did not "anticipate significant improvement" for Arguello. *Id.*

Dr. Ayres indicated Arguello had daily pain in her shoulders, wrists, and fingers, and characterized Arguello's pain as "significant." *Id.* In assessing Arguello's limitations with reaching, handling, and/or fingering, Dr. Ayres specified that, within an 8-hour work day, Arguello could "rarely" lift less than ten pounds. R. 200. She reported that Arguello's hands could grasp, turn, and twist objects only 2% of each work day (fewer than ten minutes); her fingers could perform fine manipulations only 5% of the time on her right hand, and 6% of the time on her left hand (between 24 and 29 minutes of the workday); and her arms could reach in front of her body and overhead only 5% of the time (about 24 minutes of the workday). *Id.*

Additionally, Dr. Ayres noted that Arguello would need "frequent[]" unscheduled breaks due to muscle weakness, pain, chronic fatigue, and adverse effects of medication. R. 201. Because of her impairments and/or treatment, Dr. Ayres estimated Arguello would be absent from work more than four days each month. R. 202 (stating Arguello would miss work "generally 4 out of 5 days plus restrictions").

### F.   State Agency Physician Reviews

On April 15, 2013, state agency physician, Carolina Bacani-Longa, M.D., reviewed the medical evidence and opined that Arguello retained a residual functional capacity ("RFC") to

occasionally lift and/or carry 20 pounds, and to frequently lift and/or carry 10 pounds. R. 63. Dr. Bacani-Longa also found Arguello had "no erosive arthritis" in either hand and would therefore be able to perform "light work activity." *Id.* While agreeing that Arguello would have "some limitations" in the performance of certain work activities, Dr. Bacani-Longa and disability adjudicator, Heather Elliott, determined these limitations "would not prevent . . . [Arguello] from performing past relevant work as a[] Title Clerk." R. 64–65.

Upon reconsideration on September 6, 2013, Arguello contended her conditions had changed since her initial disability report filing and that her "legs and arms and hands ha[d] hardly any strength." R. 69, 76. The reviewing state agency also considered Dr. Ayres's medical source statement, as well as Arguello's July 2012 hand x-rays. R. 72, 74. State agency physician, Richard Surrusco, M.D., reviewed the medical evidence and opined Arguello retained a "limited" RFC to reach in any direction and to handle objects with her right hand; further, that she had an "unlimited" RFC to perform fine manipulations with her fingers. R. 78–79. Because of her "joint pain and puffiness of hands," Dr. Surrusco found Arguello would be limited to "frequent handling" but had a full range of motion of her upper and lower joints. R. 78. While Arguello reported limitations in daily activities in "reaching . . . and using her hands," Dr. Surrusco indicated that her medical records reveal she had "full range of motion of her extremities but d[id] have chronic pain. She has no synovitis of her joints, x[-]ray of hands shows no erosive changes and mild arthritis of the right hand, negative left hand." R. 76.

Lastly, Dr. Surrusco found Dr. Ayres's medical source statement to be inconsistent with the evidence, concluding that Arguello had "full range of motion of her joints and should be capable of occasional light lifting and postural movements." R. 77. Therefore, Dr. Surrusco concluded that Dr. Ayres's medical source statement was "without substantial support from other

evidence of record, which renders it less persuasive." R. 77, 79.

**G.**    ***Hearing Testimony of Vocational Expert Barbara K. Byers***

At the ALJ hearing on December 20, 2017, VE Barbara Byers informed the ALJ that a title clerk position could be found in the DOT as code # 203.582-066. R. 638. Byers responded to the ALJ's hypothetical questions concerning the availability of jobs for a person who is capable of sedentary work, "provided that work did not require more than two hours of standing or walking in an eight hour workday, would not require more than occasional postural activities, and would not require more than occasional overhead reaching bilaterally." R. 640. VE Byers testified that Arguello's past work as a title clerk would fit that profile. R. 640. Additionally, VE Byers testified that a title clerk would be required to perform "occasional reaching." R. 641.

Addressing the new evidence of Dr. Ayres's medical source statement in support of Arguello's DIB application, ALJ Pianin posed a hypothetical to VE Byers about the availability of work if Dr. Ayres's opinion was credited. R. 641–42. Understanding that Dr. Ayres's opinion would only permit Arguello to "lift and carry less than ten pounds, sit less than two hours, stand and walk less than two hours," and would also result in her missing work "four to five times on average per month," VE Byers opined that Arguello would be precluded from all full-time work. *Id.*

Arguello's attorney, Brian Gillette, also questioned VE Byers regarding the limitations identified by Dr. Ayres. R. 644. VE Byers testified that a hypothetical person with the reaching, standing, and sitting limitations described in the ALJ's first hypothetical, who "would also only be able to rarely use their hands to grasp, turn or twist objects and rarely use the fingers of the right hand for fine manipulations, and only occasionally use the left fingers for fine manipulations," could not perform the work of a title clerk. R. 644.

### III.   THE ALJ'S DECISION

To evaluate Arguello's claim of disability,[7] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether Arguello: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her RFC; and (5) could perform any other work considering her RFC, age, education, and work experience. R. 578–85.

The ALJ found that Arguello last met the insured requirements[8] of the Social Security Act on December 31, 2012, her DLI, and that she did not engage in substantial gainful activity during the period from her alleged onset date of disability of September 18, 2010 through December 31, 2012. R. 580.

At steps two and three, ALJ Pianin found that Arguello had the following severe impairments: (1) fibromyalgia; (2) SLE; (3) Sjögren's Syndrome; and (4) MCTD. *Id.* The ALJ classified any additional impairments—vision disorder, insomnia, history of traumatic brain

---

[7] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); 42 U.S.C. § 423(d)(1). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

[8] To qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. §§ 404.101(a), 404.131(b).

injury, depression, and anxiety—as non-severe. R. 580–81. ALJ Pianin further determined that Arguello's mild osteoarthritis ("OA") was non-severe.[9] R. 581. Additionally, the ALJ determined Arguello's severe impairments, either singly or in combination (together with non-severe conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three, including immune system disorders 14.02 (SLE), 14.06 (MCTD), and 14.10 (Sjögren's Syndrome). R. 581. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

ALJ Pianin next found Arguello possessed the RFC to perform a range of sedentary work, *see* 20 C.F.R. §§ 404.1567(a), subject to the limitations that she: (1) "sit for six and stand and/or walk for two hours in an eight-hour workday"; (2) "occasionally climb, balance, stoop, kneel, crouch and crawl"; and (3) "occasionally perform overhead reaching with her bilateral extremities." R. 581. Based upon this RFC assessment, ALJ Pianin determined at step four that Arguello could not return to her past relevant work as a telephone clerk.[10] R. 584. However, based on the RFC assessment and vocational expert testimony, the ALJ found that Arguello could return to her past relevant work as a title clerk. *Id.*

Because the ALJ found Arguello was not under a disability at step four, he did not make an alternative finding at step five. *See* 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to

---

[9] In finding that the above-mentioned physical impairments were non-severe, the ALJ opined the impairments "did not exist for a continuous period of at least 12 months; were responsive to medication; did not require any significant medical treatment; and did not result in any continuous exertional or nonexertional functional limitations." R. 581. *See* 20 C.F.R. § 404.1509; *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

[10] Whether Arguello could return to her past work as a telephone clerk was at issue in the initial hearing and original ALJ decision. R. 584. *See Arguello v. Colvin*, No. 4:16cv138, ECF Nos. 14.

the next step."); *see also, e.g.*, *Mitchell v. Commissioner of Social Security*, 393 F. App'x 651, 653 n.1 (11th Cir. 2010) ("The existence of other jobs goes to step five of the evaluation process, and the ALJ in this case never reached step five because the regulations required him to stop once he found [plaintiff] not disabled at step four.").

Accordingly, the ALJ concluded Arguello was not disabled from September 18, 2010 through December 31, 2012, and was ineligible for DIB. R. 584. *See* 20 C.F.R. § 404.1520(f).

## IV.   **STANDARD OF REVIEW**

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's

17

findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V.   ANALYSIS

**A.    *There is no conflict between the DOT/SCO's handling requirements for title clerks and the state agency medical consultant's opinion that Arguello should be restricted to only "frequent" handling.***

Arguello challenges the ALJ's conclusion that she is not disabled by attacking his step four finding that she can perform her past relevant work as a title clerk.  She first argues that a conflict exists between the handling requirements for title clerks specified in the Dictionary of Occupational Titles/Selected Characteristics of Occupations[11] ("DOT/SCO") and the medical consultant's opinion that Arguello should be limited to "frequent" handling, to which the ALJ gave "great" weight.  Pl.'s Mem. 6–7.  Arguello contends that, unlike the state agency consultant's opinion, the DOT/SCO requires that title clerks be capable of "constant" handling.  *Id.* at 7.

At the ALJ hearing on December 20, 2017, VE Byers testified that Arguello's past work as a title clerk fell under DOT Code # 203.582-066.  R. 628, 638.  DOT Code # 203.582-066 appears in chapter two of the DOT, which applies to "Clerical and Sales Occupations."  U.S. Dep't

---

[11] The *Dictionary of Occupational Titles*, and its companion, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, are resources used by the SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations.  U.S. Dep't of Labor, *Dictionary of Occupational Titles*, 1991 WL 645958 (4th ed. 1991); U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993).

of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), 1991 WL 671703. Within chapter two, at section 203, the DOT lists occupations related to clerical and sales work, including "typists," and specifically typist positions such as "Title Clerk, Automobile" at DOT # 203.582-066. *Id.*

DOT Code #203.582-066 specifies the functional job requirements for all typists, including title clerks. *Id.* With respect to "handling" requirements, which are at issue in this case, the DOT specifies that a title clerk be capable of "Handling: Frequently—Exists from 1/3 to 2/3 of the time." *Id.* Thus, Arguello's contention that "this DOT per the [SCO] requires 'constant' handling," Pl.'s Mem. 7, is mistaken and at odds with the frequent handling called for in DOT Code # 203.582-066 for title clerk jobs. DOT Code # 203.582-066, 1991 WL 671703 (4th ed. 1991) (listing the postural activities and the extent to which title clerks must perform these activities); U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993) (defining "frequently" and "constantly").[12]

Consistent with the DOT/SCO job requirements for title clerks, state agency medical consultant, Dr. Surrusco, found that Arguello was capable of performing "frequent" handling. R. 78. In his decision, the ALJ explicitly gave "great weight to the State agency medical consultants' opinions that [Arguello] could perform a limited range of sedentary work, including the ability to frequently handle, grasp and finger." R. 584. As such, no conflict exists between the DOT/SCO handling requirements for title clerks and the state agency medical consultant's opinion on Arguello's handling capabilities, upon which the ALJ relied. *Id.*; *see* DOT Code # 203.582-066,

---

[12] Appendix C of the SCO defines the terms "frequently" and "constantly," and distinguishes them based on the percentage of the work day an individual would be required to perform a particular job function. *See* U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993). "Frequently" is defined in the SCO as an "[a]ctivity or condition [that] exists from 1/3 to 2/3 of the time." *Id.* The SCO defines "constantly" as an "[a]ctivity or condition [that] exists 2/3 or more of the time." *Id.*

1991 WL 671703 (4th ed. 1991).  They are fully consistent.  VE Byers also confirmed this by testifying that, per the DOT/SCO, a title clerk must be capable of performing "frequent handling and constant fingering."  R. 644–45.  VE Byers also confirmed that her testimony, which the ALJ "fully credit[ed]" and found "convincing," was consistent with the DOT.  R. 585, 642.

Accordingly, because the DOT/SCO's "frequent" handling requirements for title clerks and the medical consultant's opinion limiting Arguello to "frequent" handling are consistent with one another, the ALJ had no reason to attempt to reconcile or explain any supposed conflict.

**B.**     ***Any apparent oversight by the ALJ in failing to incorporate Arguello's "frequent" handling limitation in his RFC finding was harmless.***

Arguello also contends the ALJ erred by not including any handling limitations in his RFC finding after assigning "significant" weight to the medical consultant's opinion regarding Arguello's handling limitation.  Pl.'s Mem. 6–7; *see* R. 584 (ALJ opinion assigning "great" weight to the medical consultant's opinion relating to Arguello's handling limitations).  Arguello contends that the ALJ gave no "curative explanation" for the conflict between his RFC finding and the state agency medical consultants' opinions, to which he gave "significant" weight.  Pl.'s Mem. 6–7; *see* R. 581–84 (ALJ Pianin's opinion assigning "great" weight to the medical consultants' opinions).

Before deciding at step four that Arguello could return to working as a title clerk, the ALJ assessed her RFC.  R. 581–84.  As noted above, in doing so, the ALJ gave "great weight to the State agency medical consultants' opinions that [Arguello] could perform a limited range of sedentary work, including the ability to frequently handle, grasp and finger."  R. 584.  Additionally, the ALJ found that such opinions were "well[-]supported by the limited and conservative treatment notes."[13]  *Id.*  As Arguello correctly notes, however, the ALJ neglected to include the "frequent"

---

[13] The ALJ also rejected the contrary opinions in Dr. Ayres's medical source statement, which severely limited Arguello's handling capabilities.  R. 584.  The ALJ found Dr. Ayres's medical

handling limitation in his RFC finding for Arguello. *See* R. 581–84. The ALJ stated only that Arguello "had the residual functional capacity to perform a range of sedentary work . . . . [Arguello] can sit for six and stand and/or walk for two hours in an eight-hour workday, occasionally climb, balance, stoop, kneel, crouch and crawl, and occasionally perform overhead reaching with her bilateral extremities." R. 581; *see* 20 C.F.R. §§ 404.1545(a), 404.1527(d)(2), § 404.1545(a)(3) (outlining the ALJ's responsibilities and discretion in crafting an RFC finding). Arguello argues that the omission of the handling limitation from the RFC requires yet another remand to the ALJ. Pl.'s Mem. 7.

In response, the Commissioner argues that,

> even if the Court finds that the ALJ erred . . . by not specifically incorporating the additional handling limitations from [the state agency medical consultant's] opinion into the RFC finding, any such error is, at most, harmless, because the mere recitation of these limitations in the RFC would not have changed the ALJ's decision.

Mem. in Supp. of Def.'s Mot. for Summ. J., ECF No. 17 at 14. Essentially, the Commissioner contends that, even if the ALJ had limited Arguello to an RFC with only "frequent" handling, his finding that Arguello could perform her past relevant work as a title clerk would not have changed. *Id.* The Court agrees.

The ALJ's apparent oversight is harmless.[14] Remand is unnecessary because the only handling limitation accepted by the ALJ—Dr. Surrusco's opinion that Arguello could perform

---

source statement at odds with Dr. Ayres's and Dr. Patel's "progress notes, examination results, testing, and conservative treatment," and assigned it "little weight." *Id.*

[14] In *Bamforth v. Colvin*, the court found that, even had the "limitation to simple, repetitive tasks been included in the RFC finding, the ALJ's step four finding and ultimate disability determination would not change. . . . Therefore, the ALJ's error in failing to include this limitation in the RFC finding was harmless." No. C13-5618BHS, 2014 WL 2711827, at *3 (W.D. Wash. June 16, 2014) (citing *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012),

"frequent" handling—comported with the job requirements of a title clerk. The ALJ's finding that Arguello could return to her past work necessarily rested upon the determination that she could engage in "frequent" handling.[15]  R. 584; *cf. McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (rejecting the "unsubstantiated claim that the ALJ must have analyzed the medical evidence at step three, rather than at step four" and agreeing "that the ALJ need only review medical evidence once in his decision").  Consequently, even if ALJ Pianin had incorporated a "frequent" handling limitation in his RFC finding, he still would have concluded at step 4 that Arguello could perform her past relevant work as a title clerk because the job required only "frequent" handling.

Accordingly, substantial evidence supports the ALJ's decision that Arguello was not disabled and could perform her past relevant work as a title clerk.

## VI.    RECOMMENDATION

For the foregoing reasons, this Court recommends that Arguello's motion for summary judgment (ECF No. 14) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 16) be **GRANTED**, and the decision of the Commissioner be **AFFIRMED**.

## VII.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections

---

[15] The Fourth Circuit has found that the harmless error rule applies in the context of social security cases. *See Garner v. Astrue*, 436 F. App'x 224, 226 n.* (4th Cir. 2011) (unpublished); *Morgan v. Barnhart*, 142 F. App'x 716, 722–23 (4th Cir. 2005) (unpublished); *see also Shinseki v. Sanders*, 556 U.S. 396, 411–12 (2009) (holding that, when reviewing a decision for harmless error, a court should consider:  "an estimation of the likelihood that the result would have been different, an awareness of what body . . . has the authority to reach that result, a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings, and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference.").

to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
March 2, 2020

23